# Case No. 6,145.

## HARRISON et al. v. STEWART et al.

### [Taney, 485.] [1]

Circuit Court, D. Maryland. April Term, 1851.

BILL OF LADING—BREACH OF CONTRACT—MEASURE OF DAMAGES—PARTIES TO SUIT.

1. The contract created by the signing of a bill of lading for the carriage of goods from one seaport to another, is a maritime one, and within the jurisdiction of the admiralty.

2. Where goods are shipped on board a vessel advertised to sail for a particular port, and a bill of lading is signed for their delivery at that port, the ship-owners are bound to carry the goods, by that ship, to the port of destination, unless prevented by some event beyond their control.

3. A refusal to perform the voyage, without any legal justification, renders them liable to damages for their breach of contract.

4. In such case, if the consignee of the goods be merely the agent of the shippers, the latter are the proper parties to the suit, and entitled to recover the damages sustained.

5. Where, under the above circumstances, the ship-owners offered to return the goods, and the offer was not accepted, the measure of damages to the shippers is not the full value of the goods: damages to that amount are given to the owner when the property is withheld from him against his consent, or has been lost through the misconduct of the defendant.

6. The ship-owners were not bound to buy the goods because they had broken their contract; but were bound to make compensation for the damages sustained by its non-performance.

7. Neither could the opportunity which offered of shipping the goods by another vessel, without any additional cost or risk to the owners of them, be used as a bar, or in mitigation of damages; the shippers were not bound to seek or accept any other mode of conveyance, and it was the duty of the ship-owners to transport the goods in the manner specified in the bill of lading.

8. The damage to the owners of the goods is, the difference in value between the goods at the port of shipment, and the price they would have commanded at the port of destination, if the contract had been performed; profits that the shippers might have made by ulterior speculations, or by shipping them from the port of destination to other places and better markets,

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

are too remote to be taken into consideration in estimating the damages arising from the breach of the contract.

[Appeal from the district court of the United States for the district of Maryland.]

The respondents [David Stewart and George R. Vickers] were owners of the ship Charles and residents of the city of Baltimore. In the year 1849, they advertised her to be ready to receive freight for San Francisco, and that she was then loading at the port of Baltimore, and would positively sail about the 20th of February. On the 17th of February, the libellants [William H. Harrison and Benjamin Harrison] shipped certain merchandise, to be carried to San Francisco, and received a bill of lading therefor, by which they were made deliverable, at that place, to Joseph W. Finley, or his assigns. Finley was to go out as supercargo, and these goods were consigned to him for sale. Being unable to get a full cargo, the owners determined to break up the voyage, and on the 7th of March, made arrangements with the owners of the ship Andalusia, then in the port of Baltimore, and advertised to sail for San Francisco, by which the freight which had been intended to be sent by the Charles, was to be received on board the Andalusia, on the same terms as were expressed in the bills of lading given to the shippers by the Charles. The libellants declined to accede to this arrangement, or to receive their goods back again, but insisted that they should be carried by the Charles, according to the terms of the bill of lading; or else that the respondents should purchase the goods, at the invoice price, including expenses. The respondents declined to do either, and deposited the goods in their warehouse, subject to the order of the owners, and notified them of that fact. This libel was filed by the owners of the goods against the owners of the Charles, to recover damages for a breach of contract, in not delivering the goods at the port of San Francisco, claiming the whole value of the goods. The district court decreed in favor of the libellants, for one hundred dollars damages and costs [case unreported], from which decree they appealed to this court.

John Glenn and John Nelson, for libellants.
Wm. Schley, for respondents.

TANEY, Circuit Justice. This case involves some questions of much commercial interest, and has been fully argued by counsel; some preliminary points, however, which have been suggested in the argument, are, I think, free from difficulty. For it is very clear that, under the decisions of the supreme court, the contract created by signing the bill of lading was a maritime contract, and within the jurisdiction of the court of admiralty. It is equally clear, that the ship-owners were bound to convey the goods to the port of destination, on the ship Charles,

unless prevented by some event beyond their control; and having refused to perform the voyage without any legal justification, they are liable to damages for their breach of contract. And as the libellants were the owners of the goods, and the consignee nothing more than their agent, they are the proper parties to this suit, and entitled to recover the damages they have sustained.

The material question upon this appeal is, whether the damages awarded by the district court do not fall short of the amount which, in point of law, they are entitled to recover. In forming an opinion upon this subject, it is necessary, in the first place, to examine upon what grounds damages are to be given, and by what rule they are to be estimated. And it is proper to state, with precision, the principles upon which the judgment of the court is founded, in order that the decision in this case may not be misinterpreted or misunderstood.

It appears that, after the respondents had determined that the ship Charles should not proceed to San Francisco, they offered to forward the goods by the Andalusia, without any additional cost or risk to the shippers; that this ship was quite equal, in her character and qualities for this voyage, to the ship Charles; and upon the refusal of the libellants to accept this proposition, the respondents offered to return the goods. But this was also refused; and the goods have since remained in the warehouse of the respondents, subject at all times to the order of the owners, if they chose to receive them.

Under such circumstances, there can be no just reason for awarding to the libellants damages to the amount of the value of the goods. Damages to that amount are given as a compensation to the owner when property is withheld from him against his consent, or has been lost by the misconduct of the defendant; but in this case the shippers have not lost their goods, nor have they been detained from them for a moment against their consent. The legal right to them remains, and has always remained in the libellants; the goods themselves have always been within their reach and subject to their control, since the voyage was abandoned; and as they have not lost the property or possession of the goods, by the conduct of the ship-owners, there would seem to be no justice in compelling the respondents to pay them their value. The ship-owners are not bound to buy them, because they have broken their contract; but are bound to make compensation for the damage sustained by its non-performance.

Neither can the opportunity which offered of shipping the goods by the Andalusia, without any additional cost or risk to the libellants, be used as a bar, or in mitigation of damages. The shippers were not bound to seek or accept any other mode of conveyance; it was the duty of the ship-owners to transport the goods in the manner specified in the bill of lading; and that contract required that they should be carried to the port of destination in the ship Charles; nothing could excuse them from the performance of that duty but some unforeseen event which they had not the power to control; and if they failed to perform it, it is no excuse to say, that the libellants might have accomplished the same object by another ship, or another contract. The shippers had a right to the faithful execution of the contract they had made, and to rely upon it; and were under no obligation to look further, or accept any other contract as a substitute for it.

Under this contract, the respondents were bound to deliver these goods to the consignee of the libellants, at the port of San Francisco, and the damage which they have sustained, is the difference in the value between the goods in the port of Baltimore, in the hands of the libellants, and the price they would have commanded, if the respondents had fulfilled their agreement. This is the amount of loss which the breach of contract occasioned, and is, therefore, the amount of compensation which ought to be awarded to them. It is upon this principle that the case of Bell v. Cunningham, 3 Pet. [28 U. S.] 85, was decided by the supreme court, and the rules there laid down are equally applicable to contracts of this description. The case of Smith v. Condry, 1 How. [42 U. S.] 28, depended upon different principles; it was a case of collision; the owners of the cargo were owners of the injured vessel, and might have forwarded the cargo by another ship, if they supposed the market would be better by an earlier arrival at the port of destination; if there was any loss, therefore, from the delay, it was occasioned by the acts of the owners of the goods. The owners of the offending vessel had no right to take possession of the cargo and forward it to its destined port; the injury which they had done, was, the amount to which they had damaged it, and diminished its value by the collision, at the time and place where it happened.

The remaining inquiry is, would the goods, if delivered according to the bill of lading, have commanded a higher price than they were worth in Baltimore, when the voyage was abandoned? In determining this question, we must take into consideration the time when the vessel ought to have sailed, and the ordinary length of the voyage. She was advertised to sail "positively," about the 20th February, 1849, and she was bound to sail on or near that day. The language of the advertisement does not confine her to a precise day, and it would depend upon the usage of trade to determine what delay was admissible; but in the absence of evidence as to usage, the language of the advertisement would not justify a delay of more than a few days, for it is upon the faith of this promise, that the merchant must be presumed to have shipped his goods to a market known to be subject to sudden and great

fluctuations, and if he sustains a loss. by the unreasonable delay of the vessel, he is justly entitled to compensation.

It is, however, not necessary to pursue this inquiry; for if the Charles had sailed on the day mentioned in the advertisement, she could not, upon any reasonable calculation, have arrived at San Francisco until late in June. Captain Hugg describes the state of the market from May 1849, until near the close of the year, during which time he was in California, or on that coast; and Captain Codman describes it, in like manner, from the 18th of August to the end of that year. They are both evidently men of much intelligence and observation, and fully acquainted with the matters of which they speak; and they both .describe the market at San Francisco as in a state of great depression during the whole time they were respectively acquainted with it, and testify that the goods proposed to be shipped by the libellants, at the prices mentioned in the invoice, must have resulted, not in a profit, but in a heavy loss.

It is very true, that Mr. Finley thinks otherwise; his testimony has been taken under the act of congress, ex parte, since the decree was passed in the district court; and he states that, if the Charles had sailed at the time for which she was advertised, and arrived in the usual period of such a voyage, he could have sold these goods for an hundred per cent. profit on the invoice price; but he does not mention any period in the spring of 1849, when the market became suddenly depressed. The testimony of Captain Hugg certainly applies to a period antecedent to that at which the Charles could possibly have arrived, and Captain Codman, who arrived there in August, found the market in the same state of depression described by Captain Hugg; and although all of the witnesses agree that the market of San Francisco has been subject to sudden and violent fluctuations, there appears to have been nothing but a continued glut and depression of price, from May, 1849, to the close of that year, so far as concerned articles like those contained in the libellants' invoice.

It may be, that Mr. Finley having remained in California ever since he went there in the spring in 1849, may have confounded in his memory prices, which may have prevailed at an earlier period of the spring, with the prices of the period of which we are speaking; at all events, it is incumbent upon the libellants who claim the damages, to prove that they have sustained damage; the court cannot presume the fact. Upon this point there is a direct conflict between the testimony of Mr. Finley and that of Captain Hugg, a witness equally respectable and entitled to equal credit; and the testimony of the latter is also supported by that of Captain Codman—not only by the state in which he found the market, but also by the character of the population he describes, and the unsuitableness of the goods mentioned in the invoice to such a class of persons as, at that time, composed the population of San Francisco. The testimony of Mr. Finley cannot outweigh this proof, that no actual loss was sustained.

In relation to the prices that might have been obtained for those goods, at Coquimbo, or other ports usually touched at in the Pacific, it is sufficient to say, that there is no evidence upon this subject; Mr. Finley as well as the other witnesses, must be understood as speaking of the market of San Francisco. And if this testimony is to be understood as referring to other ports, and to be correct as to prices there. it could not alter the judgment of the court. The contract of the respondents was to deliver the goods at San Francisco; there is no engagement to stop or deliver them at other ports. Their value at that port is, therefore, the true test; and profits that the shippers might have made, by ulterior speculations, and by shipping them from San Francisco to other places and better markets, are too remote to be taken into consideration, in estimating the damages arising from a breach of this contract.

The decree of the district court must, therefore, be affirmed, with costs.